David Wong (SBN 234788)
2930 Domingo Ave #149
Berkeley CA 94705
Attorney for Plaintiff Andreas Weigend
Telephone: (510) 684 2759

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Andreas Weigend,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>Musicstrands Inc., Strands Inc.,<br><br>Mystrands Inc., and DOES 1-50,<br><br>　　　　Defendants | Case No.:   3:08-cv-00726 PJH<br><br>AMENDED COMPLAINT FOR BREACH OF CONTRACT; BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, UNJUST ENRICHMENT, QUANTUM MERUIT<br><br>JURY TRIAL DEMANDED |

Plaintiff Andreas Weigend, by and through his attorney, David Wong, for his complaint against Defendants, states as follows:

## I. INTRODUCTION

Andreas Weigend is seeking compensation for services he rendered to Musictrands, Inc.  Dr. Andreas Weigend is a world expert in measuring user behavior and in leveraging the fundamental principles underlying human communication patterns. He helps his clients understand how they can fully utilize data and shows them how to respond to the most important web and mobile trends of today's fast changing world. Andreas was the chief scientist of Amazon.com, and now works as independent consultant and advisor both with exciting, innovative startups and with the leaders of visionary multinationals. He also teaches at two top universities, Stanford and Tsinghua (Beijing). He is a sought-after speaker at conferences.  Musicstrands, Inc. is "social recommendation and discovery" company based in Oregon.

- 1

In December 2004, Musicstrands's CEO made a number of statements both in writing and verbally to Dr. Weigend in order to induce him to work for Musicstrands, Inc. Musicstrands's CEO promised to give Dr. Weigend thousands of stock options and cash. He also estimated what those options would be worth. On January 15, 2005, Weigend and Musicstrands entered into a contract for Weigend to give valuable business insights and strategic advice to Musicstrands's fledging enterprise. The total amount that Musicstrands, Inc. owes Dr. Weigend for his services and expenses he incurred on their behalf is $117,500.

## II. JURISDICTION AND VENUE

1. Venue is proper in this Court because Andreas Weigend signed the contract last in San Francisco County, and therefore, this is the county where the contract was entered into.

2. This Court has diversity jurisdiction over the matter because the amount controversy exceeds $75,000 and because opposing parties have diverse citizenship.

## III. ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

3. According to its website, Defendant Mystrands Inc (also known as Strands , Inc or Musicstrands, Inc) has offices in Corvallis, Oregon, New York City, New York, San Francisco, California, Washington DC, and Madrid, Spain.

4. Plaintiff is informed and believes, and thereon alleges, that Defendant has a business office operating in San Francisco (based on Musicstrands's website) in the State of California.

5. Plaintiff is ignorant of the true names and capacities of defendants sued as Does 1 through 50, inclusive, and therefore sues these defendants by these fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when they have been ascertained. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named defendants is in breach of some contract or is tortiously or

otherwise legally responsible in some manner for the occurrences alleged in this complaint and for plaintiff's damages.

6. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 5 and the introductory paragraph of this Complaint as though fully set forth herein.

## IV. CAUSES OF ACTION

Andreas Weigend asserts the following causes of action against Musicstrands in this matter:

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT

7. Plaintiff re-alleges and incorporates herein by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.
8. On January 15, 2005, plaintiff and defendant entered into a contract for Dr. Andreas Weigend to become Musicstrands's Chief Strategist, for valuable consideration. A true and correct copy of this contract is attached to this complaint and incorporated by reference in it as Exhibit 1.
9. Among other things, as part of this contract the defendant agreed to pay plaintiff a total of 25,000 non-statutory stock options at a purchase price of $.50 USD per share (5,000 options per meeting), plus $2500 for each full-day meeting.
10. Plaintiff has duly performed all the terms and conditions of the contract on his part.
11. The defendant breached the contract in that it has failed and neglected to perform the contract in that it has failed or refused to pay plaintiff the sum of $117,500, despite its acceptance and subsequent use of Plaintiff's business consulting services.
12. Plaintiff has demanded that the defendant fulfill its obligations on the contract, but the defendant has failed and refused and continues to fail and refuse to do so.
13. Defendant never notified Plaintiff that it was terminating Plaintiff's work with Defendant.

14. By reason of the defendant's breach of contract, the plaintiff has been damaged in the sum of $117,500.

### SECOND CAUSE OF ACTION: BREACH OF IMPLIED IN FACT CONTRACT

15. Plaintiff re-alleges and incorporates herein by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.
16. Plaintiff performed all of the above-mentioned acts as part of the course of dealing between Plaintiff and Defendant, as reflected by the Agreement and the invoices sent by Plaintiff to Defendant, and as a result of the personal understanding between Plaintiff and Defendant, as well as the result of oral and written representations creating and enforcing Plaintiff's reasonable expectation that Defendant would continue to perform under the implied in fact contract between Plaintiff and Defendant.
17. Plaintiff has performed all conditions, covenants and promises required on its part to be performed in accordance with the implied in fact contract,
18. Defendant has breached the implied in fact contract by failing to pay the amounts reflected by the invoices sent by Plaintiff to Defendant in accordance to the terms of the implied in fact contract.
19. Plaintiff has made repeated demands upon Defendant to perform under the implied in fact contract by paying all monies due and owing for services performed by Plaintiff, but Defendant has refused.
20. As a direct and proximate result of Defendant's breaches of its contractual duties, Plaintiff has been damaged in the approximate amount of at least $117,500.00, plus interest on that amount at the rate of ten percent (10%) per annum from the time of breach. Further, based on Defendant's breaches of its contractual duties, Plaintiff has incurred attorneys' fees and costs of bringing this action. Plaintiff will continue to incur such interest, fees and costs in amounts to be proven at time of trial.

### THIRD CAUSE OF ACTION: Common Count For Services Performed

21. Plaintiff repeats and re-alleges the allegations contained in paragraph 1 through 19, inclusive, above and incorporates the same by reference as though set forth in full herein,
22. Within the last two years, Defendant became indebted to Plaintiff in the sum of $7,500.00 for services performed by Plaintiff at the request of and for the benefit of Defendant at an agreed price,
23. Plaintiff has repeatedly demanded payment from Defendant. The last demand was made on or about October 2007.
24. Defendant left a balance due of $7,500, plus 40,000 stock options worth $110,000, plus interest on that amount at the rate of ten percent (10%) per annum from and after the date payments were due.
25. Defendant requests Plaintiff continue working after the contract was up, and Plaintiff so obliged by travelling to Corvallis and Spain for meetings on Defendant's behalf.

### **FOURTH CAUSE OF ACTION : (Unjust Enrichment/Quantum Meruit)**

26. Plaintiff repeats and re-alleges the allegations contained in paragraph 1 through 25 inclusive, above and by reference thereto, incorporates the same as though set forth in full herein,
27. Within the last three years, Plaintiff performed services at the request of, on behalf of and for the benefit of Defendant.
28. Defendant knew that these services were being provided and promised to pay their reasonable value.
29. Plaintiff reasonably relied on Defendant's promise to pay for services rendered.
30. The fair and reasonable value of the services provided to the Defendant was at least $117,500.00.
31. Plaintiff has repeatedly demanded payment of the remaining balance from Defendant. However, Defendant has failed and refused, and continues to fail and refuse, to reimburse Defendant for the remaining balance.

32. Plaintiff is informed and believes and based thereon alleges, that Defendants benefited from being introduced to Plaintiff's business connections. Defendant has therefore been unjustly enriched by failing to pay Plaintiff for the work involved in making these introductions happen.

33. As a direct and proximate result of the above-referenced acts and omissions by Defendant, Plaintiff is entitled to restitution of the amount by which Defendant was unjustly enriched.

### *PRAYER*

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1. For actual damages in the sum of no less than $117,500.00
2. For interest thereon as authorized by law;
3. For costs of suit incurred herein; and
4. For special damages;
5. For reasonable attorney fees;
6. For such other and further relief as the Court deems just and proper,

          David Wong
         Date: February 29, 2008

# EXHIBIT 1

MediaStrands, Inc.

Non-Statutory Stock Option Agreement

This Agreement is between MediaStrands, Inc., a Delaware corporation (the "Company"), and **Andreas Weigend** (the "Optionee"), pursuant to the Company's 2004 Stock Incentive Plan (the "Plan"). The Company and Optionee agree as follows:

1. **Option Grant.** The Company grants to the Optionee on the terms and conditions of this Agreement the right and the option (the "Option") to purchase all or any part of **25,000** shares of the Company's Common Stock at a purchase price of **$0.50 USD** per share. The terms and conditions of the Option grant set forth in attached Exhibit A are incorporated into and made a part of this Agreement. The Option is not intended to be an Incentive Stock Option as defined in Section 422 of the Internal Revenue Code of 1986, as amended, and is therefore a Non-Statutory Stock Option.

2. **Grant Date; Expiration Date.** The Grant Date for this Option is **August 1, 2005**. The Option shall continue in effect until the tenth anniversary of the Grant Date (the "Expiration Date") unless earlier terminated as provided in Sections 2, 7 or 8 of Exhibit A. The Option shall not be exercisable on or after the Expiration Date.

3. **Exercise of Option.** The Vesting Reference Date of this Option is **March 1, 2005**. The Option will become exercisable in accordance with Section 1 of Exhibit A.

The parties have executed this Agreement in duplicate as of the Grant Date.

MediaStrands, Inc.

By: [signature]

Print: FRANCISCO J MARTIN

Title: CEO

Address: 760 SW MADISON, SUITE 106
CORVALLIS, 97330 OR

Optionee: Andreas Weigend [signature]

4150 17TH ST #12
San Francisco, CA 94114
USA

December 23, 2004

Andreas Weigend

    Re:    MusicStrands, Inc.

Dear Dr. Weigend:

    I am pleased to offer you a position as Chief Strategist of MusicStrands, Inc. (the "Company"). Enclosed is a description of an Advisory Board member's role (Exhibit A).

    You will receive options to purchase 25,000 shares of the Company's common stock. These options will vest in equal monthly installments over two years during your service, and will have a term of ten years and an exercise price of $0.50 a share. These options will be granted to you pursuant to the Company's Stock Incentive Plan, and will be subject to the other terms and conditions contained in the plan and your stock option agreement.

    Your role as Advisory Board Member with the Company will be on an "at will" basis, meaning that either you or the Company may terminate the relationship at any time with or without causes and for any lawful reason.

    If you accept the Company's offer, please sign below accepting the appointment, agreeing to the issuance and terms of the options, and agreeing to the terms of the Advisor Confidentiality Agreement (Exhibit C) and then return the signature page to me. I look forward to working with you and hope that you will enjoy your service with MusicStrands, Inc.

Sincerely,

Francisco J. Martin
CEO

I, Andreas Weigend, hereby accept my appointment to the MusicStrands, Inc. Advisory Board, agree to the terms of the attached Stock Option Agreement, and agree to the terms of the attached Advisor Confidentiality Agreement.

_____
Signature

Jan 15, 2005
Date

MediaStrands, Inc.

Exhibit A to
Non-Statutory Stock Option Agreement

1. **Time of Exercise of Option.** Until it expires or is terminates as provided in Sections 2, 7, or 8 of this Exhibit A, the Option may be exercised from time to time to purchase whole shares as to which it has become exercisable. The Option shall become exercisable as follows: 1/24th of the shares at the end of each one-month period after the Vesting Reference Date, so that the Options will be fully exercisable on the second anniversary of the Vesting Reference Date.

2. **Termination of Employment or Service.**

2.1. **General Rule.** Except as provided in this Section 2, the Option may not be exercised unless at the time of exercise the Optionee is employed by or in the service of the Company and shall have been so employed or provided such service continuously since the Grant Date. For purposes of this Exhibit A, the Optionee is considered to be employed by or in the service of the Company if the Optionee is employed by or in the service of the Company or any parent or subsidiary of the Company (the "Employer").

2.2. **Termination Generally.** If the Optionee's employment or services with the Company terminates for any reason other than because of total disability or death as provided in Sections 2.3 or 2.4, the Option may be exercised at any time before the Expiration Date or the expiration of 90 days after the date of termination, whichever is the shorter period, but only if and to the extent the Optionee was entitled to exercise the Option at the date of termination.

2.3. **Termination Because of Total Disability.** Unless otherwise determined by the Board of Directors, if the Optionee's employment or service with the Company terminates because of total disability, the Option may be exercised at any time before the Expiration Date or before the date 12 months after the date of termination, whichever is the shorter period, but only if and to the extent the Optionee was entitled to exercised the Option at the date of termination. The term "total disability" means a medically determinable mental or physical impairment that is expected to result in death or has lasted or is expected to last for a continuous period of 12 months or more and that, in the opinion of the Company and two independent physicians, causes the Optionee to be unable to perform duties as an employee, director, officer or consultant of the Employer and unable to be engaged in any substantial gainful activity. Total disability shall be deemed to have occurred on the first date after the two independent physicians have furnished their written opinion of total disability to the Company and the Company has reached an opinion of total disability.

2.4. **Termination Because of Death.** Unless otherwise determined by the Board of Directors, if the Optionee dies while employed by or in the service of the Company, the Option may be exercised at any time before the Expiration Date or before the date 12 months after the date of death, whichever is the shorter period, but only if and to the extent the Optionee was entitled to exercise the Option at the date of death and only by the person or persons to whom the Optionee's rights under the Option shall pass by the Optionee's will or by the laws of descent and distribution of the state or country of domicile at the time of death.

2.5. **Leave of Absence.** Absence on leave approved by the Employer or on account of illness or disability shall not be deemed a termination or interruption of employment or service. Unless otherwise determined by the Board of Directors, vesting of the Option shall continue during a medical, family or military leave of absence, whether paid or unpaid, and vesting of the Option shall be suspended during any other unpaid leave of absence.



Portlnd2-4527461.1 0061692-00001

ACW

2.6. **Failure to Exercise Option.** To the extent that following termination of employment or service, the Option is not exercised within the applicable periods described above, all further rights to purchase shares pursuant to the Option shall cease and terminate.

3. **Method of Exercise of Option.** The Option may be exercised only by notice in writing from the Optionee to the Company of the Optionee's binding commitment to purchase shares, specifying the number of shares the Optionee desires to purchase under the Option and the date on which the Optionee agrees to complete the transaction, which may not be more than 30 days after delivery of the notice, and, if required to comply with the Securities Act of 1933, containing a representation that it is the Optionee's intention to acquire the shares for investment and not with a view to distribution.

On or before the date specified for completion of the purchase, the Optionee must pay the Company the full purchase price for those shares in cash or by check, or in whole or in part in Common Stock of the Company valued at fair market value provided such Common Stock has been previously acquired and held by the Optionee for at least six months. The fair market value of Common Stock provided in payment of the purchase price shall be the closing price of the Common Stock last reported before the time payment in Common Stock is made or, if earlier, committed to be made, if the Common Stock is publicly traded, or another value of the Common Stock as specified by the Company. No shares shall be issued until full payment for the shares has been made, including all amounts owed for tax withholding. The Optionee shall, immediately upon notification of the amount due, if any, pay to the Company in cash or by check amounts necessary to satisfy any applicable federal, state and local tax withholding requirements. If additional withholding is or becomes required (as a result of exercise of the Option or as a results of disposition of shares acquired pursuant to the exercise of the Option) beyond any amount deposited before delivery of the certificates, the Optionee shall pay such amount to the Company, in cash or by check, on demand. If the Optionee fails to pay the amount demanded, the Company or the Employer may withhold that amount from other amounts payable to the Optionee, including salary, subject to applicable law.

4. **Disqualifying Disposition.** If the Option is an Incentive Stock Option and if within two years after the Grant Date or within 12 months after the Option, the Optionee sells or otherwise disposes of Common Stock acquired on the exercise of the Option, the Optionee shall within 30 days of the sale or disposition notify the Company in writing of (i) the date of the sale or disposition, (ii) the amount realized on the sale or disposition and (iii) the nature of the disposition (e.g., sale, gift, etc.).

5. **Nontransferability.** The Option is nonassignable and nontransferable by the Optionee, either voluntarily or by operation of law, except by will or by the laws of descent and distribution of the state or country of the Optionee's domicile at the time of death, and during the Optionee's lifetime, the Option is exercisable only by the Optionee.

6. **Stock Splits, Stock Dividends.** If the outstanding Common Stock of the Company is hereafter increased or decreased or changed into or exchanged for a different number or kind of shares or other securities of the Company by reason of any stock split, combination of shares, dividend payable in shares, recapitalization or reclassification, appropriate adjustment shall be made by the Company in (i) the number and kind of shares subject to the Option, or the unexercised portion thereof, and (ii) the Option price per share, so that the Optionee's proportionate interest before and after the occurrence of the event is maintained. Notwithstanding the foregoing, the Company shall have no obligation to effect any adjustment that would or might result in the issuance of fractional shares, and any fractional shares resulting from any adjustment may be disregarded or provided for in any manner determined by the Company. Any such adjustments made by the Company shall be conclusive.



7. **Mergers, Reorganizations, Etc.** In the event of a merger, consolidation, plan of exchange, acquisition of property or stock, split-off, spin-off, reorganization or liquidation to which the Company is a party or any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) or all, or substantially all, of the assets of the Company (each, a "Transaction"), the Company shall, in its sole discretion and to the extent possible under the structure of the Transaction, select one of the following alternatives for treating the Option:

7.1. The Option shall remain in effect in accordance with its terms.

7.2. The Option shall be converted into an option to purchase stock in one or more of the corporations, including the Company, that are the surviving or acquiring corporations in the Transaction. The amount, type of securities subject thereto and exercise price of the converted Options shall be determined by the Company, taking into account the relative values of the companies involved in the Transaction and the exchange rate, if any, used in determining shares of the surviving corporation(s) to be held by holders of shares of the Company following the Transaction. The converted Option shall be vested only to the extent the vesting requirements relating to the Option have been satisfied.

7.3. The Company shall provide a period of 30 days or less before the completion of the Transaction during which the Option may be exercised to the extent then exercisable, and upon the expiration of that period, the Option shall immediately terminate., The Company may, in its sole discretion, accelerate the exercisability of the Option so that the Option is exercisable in full during that period.

8. **Dissolution.** In the event of the dissolution of the Company, the Company shall provide a period of 30 days or less before the dissolution of the Company during which the Option may be exercised to the extent then exercisable, and upon the expiration of that period, the Option shall immediately terminate. The Company may, in its sole discretion, accelerate the exercisability of the Option so that the Option is exercisable in full during that period.

9. **Market Stand-off.** The Optionee agrees, in connection with any public equity offering by the Company, (a) not to sell or otherwise dispose of any securities of the Company in conformance with terms of the lock-up or similar agreement proposed by the underwriters for such offering and (b) to execute an agreement in the form proposed; provided that (x) substantially all of the Company's officers and directors enter into identical agreements, (y) the restrictive period does not exceed 180 days following the offering, and (z) the failure to execute a form of agreement shall not affect the enforceability of this covenant. To enforce this covenant, the Company may impose stop-transfer instructions with respect to the securities of the Optionee until the end of the restrictive period.

10. **Conditions on Obligations.** The Company shall not be obliged to issue shares of Common Stock upon exercise of the Option if the Company is advised by its legal counsel that such issuance would violate applicable state or federal laws, including securities laws. The Company will use its best efforts to take steps required by state or federal law or applicable regulations in connection with issuance of shares upon exercise of the Option.

11. **No Right to Employment or Service.** Nothing in the Plan or this Agreement shall (i) confer upon the Optionee any right to be continued in the employment of an Employer or interfere in any way with the Employer's right to terminate the Optionee's employment at will at any time, for any reason, with or without cause, or to decrease the Optionee's compensation or benefits, or (ii) confer upon the Optionee any right to be retained or employed by the Employer or to the continuation, extension, renewal or modification of any compensation, contract or arrangement with or by the Employer.



12. **Successors of Company.** This Agreement shall be binding upon and shall inure to the benefit of any successor of the Company but, except as provided herein, the Option may not be assigned or otherwise transferred by the Optionee.

13. **Notices.** Any notices under this Agreement must be in writing and will be effective when actually delivered or, if mailed, three days after deposit into the United States mail by registered or certified mail, postage prepaid. Mail shall be directed to the addresses stated on the face page of this Agreement or to such address as a party may certify by notice to the other party.

14. **Rights as a Shareholder.** The Optionee shall have no rights as a shareholder with respect to any shares of Common Stock until the date the Optionee becomes the holder of record of those shares. No adjustment shall be made for the dividends or other rights for which the record date occurs before the date the Optionee becomes the holder of record.

15. **Amendments.** The Company may at any time amend this Agreement if the amendment does not adversely affect the Optionee. Otherwise, this Agreement may not be amended without the written consent of the Optionee and the Company.

16. **Governing Law.** This Agreement shall be governed by the laws of the state of Oregon.

17. **Complete Agreement.** This Agreement constitutes the entire agreement between the Optionee and the Company, both oral and written concerning the matters addressed herein, and all prior agreements or representations concerning the matters addressed herein, whether written or oral, express or implied, are terminated and of no further effect.



# ADVISOR CONFIDENTIALITY AGREEMENT

The undersigned, Andreas Weigend (the "Advisor"), acknowledges that as of November 1, 2004 (the "Effective Date") (a) Advisor is serving on the Advisory Board of MusicStrands, Inc. (the "Company"), (b) during the course of such service, Advisor has and will continue to have access to confidential information of the Company not readily available to the public, and (c) Advisor has and will continue to serve in a position of trust and confidence. Acknowledging that the Company is relying on this agreement in asking Advisor to serve on the Advisory Board and giving Advisor access to confidential information, Advisor agrees as follows:

1. Confidential Information. As used herein, "Confidential Information" shall mean: (i) all business information I receive from Company or its clients, including scientific, technical, marketing, production or management information (including such as information as costs, profits, pricing policies, markets, sales, suppliers, customers, vendors, subcontractors, plans for future development, plans for current or future products, projects, or services, marketing plans or strategies); (ii) all data that has been researched, compiled, developed and/or maintained by Company; (iii) all personnel information I receive from Company or its clients, such as employee compensation and performance data; (iv) information related to products, processes, software, designs, formulae, and tests; (v) any other information I receive from Company that is not generally disclosed to the public; and (vi) all other trade secrets and nonpublic intellectual property. Advisor acknowledges that all Confidential Information is a valuable asset of the Company and shall continue to be the exclusive property of the Company whether or not prepared in whole or in part by Advisor and whether or not disclosed to Advisor or entrusted to his or her custody in connection with his or her association by the Company.

2. Nondisclosure of Confidential Information. From the date of signing this Agreement and perpetually thereafter, Advisor agrees to maintain the confidentiality of all Confidential Information (as defined above), written or oral, that Advisor receives while providing services or advice to Company. Except as required to perform the services or advice to Company, Advisor agrees that he or she will not, directly or indirectly, disclose, use, copy, publish, or summarize any Confidential Information in any form, or otherwise use Confidential Information for any purpose unless Advisor has the prior written consent of Company. If this Agreement is entered into after Advisor has begun providing services or advice to the Company, then Advisor hereby represents and warrants to the Company that Advisor has, at all times subsequent to the date I first began providing services or advice, maintained the confidentiality of the Confidential Information and have not directly or indirectly disclosed, used, copied, published, or summarized in the manner and as provided above. Advisor agrees to cease using all Confidential Information when Advisor ceases to provide advice or services to Company.



3. Obligations to Others. Advisor warrants that (a) his or her service to the Company does not violate any agreement with any prior employer or other person or firm, (b) he or she is not subject to any existing confidentiality or noncompetition agreement or obligation, except as has been fully disclosed in writing to the Company, and (c) Advisor will not use or disclose in connection with his or her service to the Company any confidential information belonging to any other person or firm. Advisor also agrees to be bound by all confidentiality and invention obligations and restrictions of the Company to third parties if Advisor is informed of

such by the Company and agrees to take all action necessary to discharge the obligations of the Company thereunder.

4. Remedies. Advisor acknowledges that breach of this Agreement by Advisor will cause irreparable harm to the Company and agrees to the entry of a temporary restraining order and permanent injunction by any court of competent jurisdiction to prevent breach or further breach of this Agreement, in addition to any other remedy available to the Company at law or in equity.

5. Severability of Provisions. The provisions hereof are severable, and if any provision is held invalid or unenforceable, it shall be enforced to the maximum extent permissible, and the remaining provisions shall continue in full force and effect.

6. Oregon Law to be Applied. The interpretation of and performance under this Agreement shall be governed by the laws of the State of Oregon, exclusive of choice of law rules.

7. Attorneys Fees. If any action or suit is instituted to enforce Advisor's obligations hereunder, the prevailing party shall be entitled to recover from the other party, in addition to any other rights and remedies it may have, all reasonable expenses and attorneys' fees at trial, on appeal, and in connection with any petition for review.

**IN WITNESS WHEREOF**, the parties have duly signed and delivered this Agreement as of the Effective Date.

ADVISOR

_____
(Signature)

4150 17th St #12
(Address)

San Francisco CA 94114

January 15, 2005
(Date)

COMPANY

_____
(Signature)

Francisco J. Martin
(By)

November 1st, 2004
(Date)

# EXHIBIT A
## Chief Strategist
## MUSISCRANDS, INC.

We are convinced that you are an experienced business executive and scientist who can provide us with his vision, provide counsel about our specific business and/or technology, and actively help us to develop major business opportunities. We intend to structure your input in two ways:

1. Most commonly we will schedule face-to-face or phone meetings between you and our management team to capture your input individually.

2. Secondarily we may periodically schedule in-person meetings with groups of our advisors to enable interaction between our advisors as part of the input process. Prior to each meeting we will try to prepare and send you an effective executive summary so that you can understand the issues we would like to discuss.

We will compensate you on the following terms:

- **Cash**: As we consider that you will be devoting significant time to our business we will pay you $2,500 for full-day meetings. If meetings last more than one day we will pay you $2,500 for each additional full-day.

- **Stock options**: : You will receive 5,000 stock options from our initial stock option plan for full-day meetings independently of whether meetings last one or more days. All these options will be subject to vesting. We will send you the specific terms and conditions of our initial stock option plan very soon.

- **Travel expenses**: We will pay you $1,500 as a contribution toward airfare per meeting independent of location. Local accommodation will be paid directly by MusicStrands.