Law Office of David Wong
David D. Wong, SBN#234788
2930 Domingo Ave #149
Berkeley CA 94705
d@davidwonglaw.com
1 (510) 684 2759
Attorney for Plaintiff Andreas S. Weigend

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| | No. C 08-00726 PJH |
| Andreas Weigend | OPPOSITION TO MOTION FOR SUMMARY JUDGMENT |
| Plaintiff | |
| VS. | Date: Wednesday, August 12, 2009 |
| | Time: 9 a.m. |
| Musicstrands, Inc.; Strands, Inc; | Place: Courtroom 3, 17th Floor |
| Mystrands, Inc, and Does 1-50, | Judge: Hon. Phyllis J. Hamilton |
| Defendants | |

I.      INTRODUCTION

This is a breach of contract case, and Strands breached its duty of good faith and fair dealing when it did not pay Weigend what it owed him.  The Court should deny Strands' motion for summary judgment because there are too many material facts in dispute.  In addition, defendants are not entitled to a judgment in their favor as a matter of law, because the 90-day stock option expiration clause (Exhibit B) was added in August 2005, after services had already been rendered and after the January 2005 contract ended in July 2005 (Exhibit A).  The 90-day stock option clause was a modification without consideration and is therefore void.

II.  STANDARD OF REVIEW

- 1

Summary judgment cannot be granted where a dispute exists as to material facts. "Material" facts are those that affect the outcome of the case under substantive law. See FRCP 56(c). A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc*. (1986) 477 US 242, 248. Here, several genuine material facts in dispute exist. The termination date (if there was one), the veracity of Strands' corporate records, and whether Exhibit A and B were signed at the same time are just some of the facts in dispute.

Rule 56 does not permit trial by affidavits. The court's function on a motion for summary judgment is issue-finding, not issue resolution. See *United States v. One Tintoretto Painting* (2nd Cir. 1982( 691 F.2d 603, 606. If there are issues that need resolution, summary judgment should not be granted because the drawing of legitimate inferences from the facts is a jury function. See *Anderson* at 249-255. For reasons we discuss below, there are genuine material facts in dispute and issues that need resolution, such as whether:

1) the August 31, 2005 90-day stock option expiration clause was a modification without consideration,

2) Weigend was terminated,

3) Weigend rendered services after July 2005 that have not been compensated,

4) Dr. Martin's testimony under penalty of perjury that he examined the corporate books and found his company owed nothing to Dr. Weigend is false in light of the fact that Strands sent Dr. Weigend paperwork in May 2007 showing Dr. Weigend was a stock option holder, and

- 2 -

5)    Weigend's e-mail to Francisco on July 13, 2006 falls within the 90 days Strands claims would have been sufficient for Weigend to exercise his stock in time[1] (assuming the 90-day expiration clause is valid).

II.    STATEMENT OF FACTS

    a.    Material facts

MusicStrands Inc. signed a contract with Weigend in January 2005 that failed to specify if the stock options issued to Weigend would expire 90 days after termination.  A true copy of the January 2005 contract is attached in Exhibit A.  The contract for services was to run from January 2005 to July 2005.

Eight months later, in August 2005, Dr. Martin meets with Dr. Weigend in San Francisco, and has him sign Exhibit B.  Dr. Weigend does so under pressure at a business dinner where he is expected to be social with both Strands and non-Strands people.[2]

Weigend continues to render services to Strands after the contract ends in July 2005.  He appears at various conferences around the world and works with Gabi to appear in the press.  Strands claims it received little or no value from this work, but it continues to ask Weigend to solve difficult problems.  Dr. Martin sends Dr. Weigend an e-mail requesting in March 2006 help with an algorithm,[3] after Weigend was allegedly terminated in December 2005 and January 2006.  Dr. Weigend is invited to appear on Strands' behalf for a summer school that is to take place in Bilbao, Spain.  Dr. Weigend is instructed to sponsor a Stanford student to make the school have an international presence.  Dr. Weigend buys a business class airplane ticket once he is told the dates of the summer school, and makes plans to appear.

---

[1] Exhibit E
[2] Weigend declaration, paragraph 16.
[3] Exhibit C

- 3 -

Dr. Weigend is then told not to come.  Dr. Martin sends e-mail to Dr. Weigend in May 2006 that leaves the relationship in a vague state.  Dr. Martin fails to attach any paperwork to exercise the stock options in 90 days.  Dr. Weigend sends an e-mail in July 2006 requesting his stock.  There is no response from Strands.

In May 2007, Strands sends Weigend the paperwork to exercise his options.  Weigend attempts to exercise his options, but Strands will not allow Weigend to exercise them.

       b. non-material statement of facts

Dr. Weigend holds a PhD from Stanford University in Physics, and was a member of the research team at Xerox's legendary Palo Alto Research Center (PARC).  Many of the computer innovations the world enjoys today originated from PARC.  Eventually, Dr. Weigend became Chief Scientist at Amazon, and later founded a consulting company.  Dr. Weigend's consulting company has an impressive roster of clients (Exhibit K).  His services are in demand all over the world as a speaker and consultant.  He has taught at some of the finest universities, including UC Berkeley and Stanford.

We are not going to waste the Court's time with correcting every non-material fact Strands got wrong, such as calling Dr. Weigend Chief Strategist for Amazon when he was really Chief Scientist, or mislabeling themselves as a "Internet 2.0" company when they meant to say they were a "Web 2.0" company.  There is no such thing as an Internet 2.0 company because Internet 2.0 refers to a non-profit consortium.  The bottom line is Strands got many of the facts wrong.

III.     LEGAL ARGUMENT

- 4 -

The moving party initially bears the burden to show there is not a genuine dispute of material fact.   They have failed to meet that burden because they cannot pinpoint the exact date Weigend was terminated.  They can't show when Weigend was terminated because he never was, and their own books show he was still involved with their company as late as May 2007.  The lack of a clear termination date is the reason they are having a hard time pinpointing the exact date the options expired.

Weigend's termination date is a factual question in dispute that this Court cannot determine by affidavits alone.  Furthermore, Strands Inc. failed to provide any legal authority to show that the manner they terminated Dr. Weigend was proper and valid.

a. **Whether Strands Can Backdate A Termination Date In Their Favor**

Strands would like to backdate the termination date to May 13, 2006, January 2006, or sometime in December 2005.  We don't mind which date defendants pick – we just want Strands to be consistent because the termination date keeps changing as the case progresses.  This changing termination date is a problem for a couple of reasons.  First, if the termination date is not fixed, Weigend is not in a position to know when his stock options expire, assuming the 90-day stock expiration clause is valid.  If Weigend is not on reasonable notice he is terminated, there is no way he can exercise his options in time.

Weigend was not terminated in December 2005.  Weigend never threatened to go to the NYT with a negative PR campaign.[4]  But according to defendants' moving papers, Dr. Martin changed his mind "for the time being."[5]  Therefore, December 2005 doesn't count as a termination.  Furthermore, defendants' moving papers indicate a desire to continue working with Weigend.  Dr. Martin sent e-mail to Weigend, which stated: "Let's speak on Saturday and see if we can

---

[4] See Weigend's declaration, paragraph 10.      - 5
[5] Defendant's moving papers, 5:13.

work something out for collaborating in other ways in the future."[6] So the e-mail is non-determinative of Weigend's status, because it all depends on what happens in the January 21, 2006 conference call. After the conference call on January 21, 2006, Weigend sent e-mail to Dr. Martin summarizing his understanding on January 23, 2006:

**From:** Andreas Weigend [mailto:aweigend@stanford.edu]
**Sent:** Monday, January 23, 2006 7:36 AM
**To:** Francisco Martin (martin@MusicStrands.com)
**Subject:** RE: Weigend Musicstrands contract and status
**Importance:** High

Dear Francisco,

I just gave a one-hour interview with Focus (who already interviewed me 2 years ago) about Musicstrands and music recommendations – they had seen the Handelsblatt article and wanted to feature it. Many questions about algorithms and tagging etc. I think I did a good job -- could only have been better if Gabi had been there.

I appreciate the good phone conversation we had on Saturday. This email summarizes my understanding:

We keep the terms we had agreed on in Corvallis THROUGH DECEMBER 31, 2005 (last year). In summary, there was a cash and an equity component for each day:
   $2.5k cash, and
   5k option units. (The options should be priced around what was the price that
      was given in the summer.)
We had agreed on 3 days per month.

Unused days from 2005 can be used by Musicstrands through July 31, 2006 for topics and activities of MusicStrand's choice. E.g., participating and contributing to the GSM conference, helping organize and present at the recommendation workshop for which I could come to Europe
   between June 6 (Tuesday),
   and June 13 (Tuesday).

Please check with your accountant whether August has been paid for or is still

---
[6] Defendant's moving papers, 6:3.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
C 08-00726 PJH

outstanding, and also whether the previous stock option agreement included August or not. Assuming August has been paid (both the cash part and the equity part), Musicstrands owes me in **CASH USD 25.5k.**
(Q4 2005 has 3 months with 3 days per month = 9 day in total. The cash corresponds to **$ 22.5** . Expenses for two trips at $1.5k are **$3k** (one to Oregon, and one to Madrid).

EQUITY: And for 9 days at 5k option units per day: giving a total of **45k options outstanding.** All equity is understood to have fully vested as of now. Should it be easier for you to have some nominal vesting date in the future, this is fine by me if you confirm our understanding.

Please confirm this as soon as possible so we are aligned in our understanding!

Andreas

Andreas Weigend | www.weigend.com | +1 650 906-5906

        Dr. Martin did not respond to this e-mail.  If the outcome of the call was to terminate Dr.

Weigend, Dr. Martin should have written a response saying "What are you talking about? I

terminated you."  He never wrote such e-mail.  Instead, Dr. Martin treated Weigend like

Weigend was still Chief Strategist and wrote to Weigend on March 15, 2006 requesting that

Weigend disclose an algorithm:

        Dearest Andreas,

        First of all, I am very sorry for not getting back to you sooner. Things have gone
        hectic lately in terms of business developments and I have been very busy.

        After reviewing our records we found we still owe you $18,000 so please let me
        know if you want us to forward a check or wire you this amount. I would also be very
        happy having a 3 day meeting (or 3 meetings) with you this year (and of course pay
        for it at a reasonable rate). Gabi is still trying to arrange a workshop on recommender
        systems in Bilbao by June. If this workshop doesn't happen we'll be surely interested
        in having you over to Bilbao at that time. I think we'll be celebrating the opening of
        the office with the Prime Minister, etc. you already know how these things are
        in Spain.

        At some point in time you mentioned that you and couple of friends had found some

kind of interesting algorithm. Can you tell more about this?

Best wishes, Francisco

Here, Dr. Francisco Martin, the CEO of Strands, is requesting Weigend to do more work.  He wants disclosure of an important algorithm.  If Dr. Martin understood Weigend was terminated in January 2006 or even December 2005, why should Weigend disclose this information if he is not Chief Strategist at Strands?  A reasonable inference from reading this e-mail is that it is a valid work order from the CEO of Strands.

Weigend simply wasn't terminated on January 21, 2006.  Strands quotes Weigend's counsel, but Weigend's former counsel wasn't there.  In other words, Strand wants to use hearsay to prove Weigend was terminated on January 21, 2006.  See FRE 802; Garside v. Osco Drug, Inc. (1st Cir 1990) 895 F.2d 46, 48.   Lawyers often get the facts wrong, just as Strands' counsel mistakenly called Weigend Chief Strategist for Amazon when he should have said Chief Scientist.

We now turn to the May 13, 2006 e-mail that Strands claims terminated Weigend. Defendants' moving papers acknowledge that the e-mail states: "So I think that is best for all of us if we leave this conversation at this stage and don't proceed any further.  Life is long and we'll be meeting for sure in many different situations in the future."[7]  Weigend is told to "leave this conversation at this stage."  What does that mean exactly?  Was the relationship terminated or was it put on hold?  Should Weigend expect his options to continue to vest given that the terms of his agreement called for the options to vest over 2 years?  After all, Weigend had already rendered services in full from January 2005 to July 2005.  There was nothing more for him to do to receive the 25,000 options.  Was the understanding that Weigend's options would continue to vest for the two years and he wouldn't be getting any more work?  It's not clear from

- 8 -

[7] 7:15.

this e-mail.  The e-mail goes on to state that "two wrongs won't make things right."  The May 13, 2006 e-mail also implies that Strands is self-declaring that it had terminated Weigend prior to May 13, 2006.  The e-mail claims Weigend had been sending proposals but none of them were accepted, and that there is a limit Strands does not want to pass.  If so, what was the termination date given that Weigend was asked by Strands to show up to Spain later in September 2006?  Weigend has ample grounds to be confused by this e-mail.  The e-mail Dr. Martin sent on May 13, 2006 is not a termination letter because it contained too many clauses subject to alternative interpretations, and failed to mention that Dr. Weigend's options would expire in 90 days from May 13, 2006.  No paperwork was given to Dr. Weigend to exercise his stock options in 2006.[8]  Defendants' counsel has felt the need to supplement the May 2006 e-mail with an explanation from Dr. Martin's 2009 deposition as to what that May 2006 e-mail meant.  The 2009 deposition was the first time we received an explanation of what Dr. Martin meant by "two wrongs don't make a right".  Therefore, the e-mail does not speak for itself.  A termination must be clear and unambiguous so that Weigend knows when to exercise his options.  With the May 13, 2006 e-mail, Strands wanted to have it both ways.  They wanted to keep the door open for other work with Weigend in the future on the one hand by telling him they would meet up with him in the future but on the other hand, they wanted to be able to backdate his termination in case they did not use him for some time.

Furthermore, it is not known when Weigend read this e-mail.  Assuming the 90-day expiration clause is valid, does the 90-day term begin when he reads it or when Dr. Martin sends the e-mail?  Strands provided no case law on this issue to explain what date is controlling.  If the Court intends to rule for summary judgment in favor of Strands, it needs to make a finding that Weigend was terminated on a specific date so that it can determine when the 90 day clock starts

- 9 -

[8] See Andreas S. Weigend Declaration, paragraph 9.

and when it ends.  The parties are in dispute over the termination date.  We don't think there is a legal basis to find Weigend was terminated on May 13, 2006 because Strands failed to show Weigend read the e-mail on May 13, 2006.  If 90 days go by and he hasn't received the e-mail, there is a question of adequate notice.

There is also a question on whether e-mail is a valid way to notify someone they've been terminated.  Strands declined in discovery to provide their standard termination letter, but we suspect that form letter would have revealed that Strands didn't follow their procedures in terminating Weigend.  The May 13, 2006 e-mail is a mess.

Even if the Court were to find the May 13, 2006 e-mail properly terminated Weigend and the modification of the contract without consideration valid, it is unknown when Weigend read that e-mail, and therefore, no one can determine the last day Weigend could exercise his stock options within the 90 day window.  Strands claims any day sometime in late August 2006 should work, but Strands Inc. cited no case law to show e-mail service was valid.  The precise date has to be known for legal reasons.  It can't be an approximation because if it is, Weigend has no way of knowing exactly when his options expire.   Again, the date Weigend was terminated is a factual question that can only be determined after weighing the evidence by a jury.

Strands claims Weigend was terminated no later than May 13, 2006, but Exhibit H shows Strands continued to use Weigend's name longer after he was allegedly terminated.  Exhibit H is a Google search of the Musicstrands website for any mention of Weigend.  Weigend should have been referred to as the "former" Chief Strategist for Strands.  Dr. Martin admitted he never issued a press release indicating Weigend was no longer with the company (See Francisco depo at 75:2-6).

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
C 08-00726 PJH

### b.   Strands' own corporate records indicate Weigend was still considered to be working for Strands long after Strands claims Weigend was terminated

It is unreasonable to expect Dr. Weigend to know he was terminated if both Dr. Weigend and the company thought he was still working for the company.  Dr. Weigend was still on the books as a stock option holder in May 2007, when Dr. Weigend received a note from Strands that indicated Dalbergia was buying Strands.[9]  Had Strands not sent this notice, Weigend never would have demanded his options.  Strands is a relatively small company and not covered in the press very much.

Strands claims this was sent to Weigend by mistake and calls it a "bookkeeping error". If it was a bookkeeping error, there should be other people who suffered from a similar bookkeeping error.  Defendants' moving papers call the bookkeeping error understandable, because Strands had a "big list" of names to manage.[10]  Yet he admits at the time there were only 60 employees (Martin Depo at 123-24).  That's hardly a big list to manage. Dr. Martin testified that he had corporate records showing that these options went back to the pool.  (Martin Depo at 124:11-13). Defendants' moving papers now admit there are no such records.  But let's assume for sake of argument that Strands' bookkeeping was a mess and this was truly a "bookkeeping error".  If so, the Court should expect Strands to have made this error with other people.  The books should have random inconsistencies and mistakes.  They should not be isolated to Dr. Weigend.  Dr. Martin testified, however, that Dr. Weigend was the only one with this error (Martin Depo, at 124:17-25).

---

[9] Exhibit G
[10] Martin Depo at 123-124.

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
C 08-00726 PJH

**c. whether Strands owes money to Dr. Weigend for preparing to teach at a summer school in Spain in 2006**

Strands argues in its moving papers that because Weigend can't remember in 2009 exactly what days he rendered services several years back, he shouldn't be reimbursed. The legal standard for determining whether Weigend is owed something is not whether Weigend can recall on the spur of the moment at a deposition exactly what he did to earn $7500. It is true Weigend could not recall exactly at the deposition. Weigend has stated in his declaration he earns $10,000 a day. It is entirely conceivable to forget what a person does on a particular day. The $7500 is for the 3 days that were supposed to be used for the 2006 summer school in Spain, and the prep time associated with preparing for it (buying a ticket, arranging for a Stanford student to be sponsored, etc).

Strands has foreseen our objections to this claim and concedes that the $7500 claim might have merit by requesting the Court to dismiss the stock option claim and remand the $7500 to small claims, but this belittling doesn't change the amount owed. Either Strands owes this money or it does not. But either way, Strands should fess up that there is a connection between the "PR Person", the VP of Communications, and this same person was also a member of the board of Strands: Gabi Aldamiz-echevarria. This person invited Weigend to teach at a summer school in Spain and Weigend incurred costs such as a business class airplane ticket to Europe, and made all the arrangements to getting a Stanford student sponsored so Strands could look good. Strands cancelled, but Weigend should be reimbursed for the work he did leading up to telling him he should not come to Spain anymore.

**d. other facts in dispute**

After Weigend's contract ended in July 2005, this Court must determine whether Weigend is entitled to the reasonable value of Weigend's services for the services he rendered between July 2005- May 2006. Weigend did render services during this time frame, but Francisco Martin claims Weigend has been paid (see Martin's declaration). It is in dispute, however, how much those services are worth. This is a factual question that is appropriate for a trial to decide. Weigend can either be compensated at the same terms as his January 2005 contract, or be paid the normal cash rate that he normally charges when there is no equity involved.

Strands Inc. is attempting to portray Weigend in a negative light by attacking his character. For example, Strands claims Weigend is a scam artist and that Weigend was hired to setup a meeting with Jeff Bezos, founder of Amazon.com and Weigend failed to do this. If this meeting was the main purpose of hiring Weigend, the offer letter issued by Strands to Weigend and contract for his services should have stated this. Nowhere in the contract does it state Weigend's sole responsibility is setting up introductions between big wigs like Jeff Bezos and Dr. Martin. While Dr. Martin expressed his disappointment about not meeting Jeff Bezos, there are no e-mails from Dr. Martin to Dr. Weigend requesting such a meeting. There are no records of any phone calls of such a request. There are no physical paper notes of such a desire. In other words, Strands has waited several years, after it allegedly terminated services with Weigend, to state that Weigend failed to setup a meeting that was never requested.

It's really odd that Strands is claiming a meeting with Bezos is the main reason for hiring Weigend, because the Court should think there ought to be a written message somewhere from Dr. Martin to Dr. Weigend about when such a meeting is going to take place. If Dr. Weigend, whose PhD is from Stanford University, is a scam artist, there ought to be a (e-mail or telephone)

- 13

message from Dr. Weigend promising to set one up but making some kind of excuse about why it's taking so long so he can get paid. There is none of that.

Weigend never promised to setup a meeting with Jeff Bezos, and although defendants cite in their moving papers Strands' interest in working with Amazon, the citation to Weigend's deposition is an exhibit of a press release sent to Weigend as an e-mail attachment. Strands' interest in working with Amazon is buried 24 paragraphs down inside of an attachment that was sent to Weigend. The e-mail message said, "This is Dow Jones Article."[11] There was no request to do anything with the article. This is an odd way to request a meeting Jeff Bezos. If the parties intended a meeting to happen, there really isn't any evidence at all to support this charge.

Weigend is not a charlatan, even though Dr. Martin claims Weigend is one. Dr. Martin offered no evidence to support this claim Dr. Weigend is a charlatan other than he is unhappy he did not get to meet Bezos. The other odd thing is that Dr. Martin claims he knew from the first meeting that Weigend was a scam artist.[12] If so, it is odd that Dr. Martin did not fire Weigend after the first meeting, or after the contract ended in July 2005. The more likely explanation is that Strands actually liked Weigend services – they just didn't like how much it cost.

Although Dr. Martin has asserted Weigend is a liar, defendants' moving papers provided no evidence of any lying on Weigend's part. There is however, some highly questionable facts asserted by Dr. Martin. First, Dr. Martin claims he told Gabi, the "PR Person", who is also the Vice President of Communications and Board member of Strands, that Weigend was no longer with the company after the conference call in December 2005 that allegedly terminated Weigend.[13] Gabi then turns around and invites Weigend to Bilbao, in Spain. Dr. Martin is being less than honest about Dr. Weigend's alleged termination. There is no reason someone like Gabi

---

[11] See defendants' moving papers, Exhibit 3 of Weigend's depo.
[12] Martin Depo at 27:10-15
[13] Martin Depo (99:23 -100:2)

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
C 08-00726 PJH

should be reaching out to Weigend to do work for Strands if Weigend is no longer with the company.  There is no reason for the CEO of Strands to be writing e-mails to Weigend asking him for information about algorithms if Weigend is terminated.

The bottom line is that Strands needed Weigend but did not want to pay him.b  If Dr. Weigend is the scam artist that Strands claims he is, Strands should have issued a press release announcing Dr. Weigend's departure the moment they claim they discovered Weigend was a scam artist and wasn't adding value.  They never did.  Dr. Martin claims he believed Dr. Weigend was a charlatan after the very first meeting.  It's just all the more reason for Dr. Martin to fire Dr. Weigend in July 2005 rather than keep asking him to show up to meetings after July 2005. Strands was perfectly happy to have the world believe Dr. Weigend was their Chief Strategist long after Dr. Weigend's contract ended.  They wanted the benefit of being associated with Dr. Weigend, but they did not want to pay for it.  Why did Strands continue to ask Dr. Weigend to show up to conferences and appear on their behalf not once, but MULTIPLE TIMES long after their relationship allegedly ended?  Strands did so because there was a clear benefit to Strands.   Having someone of Dr. Weigend's caliber boosted Strands' image.

e.  **What Law Governs?**

Strands claims Oregon law governs because the choice of law provision cites Oregon even though the January 2005 and August 2005 contracts were entered into in California.[14]  Oregon law governs if California does not have "a materially greater interest" than Oregon or would be the state of the applicable law in the absence of an effective choice of law by the parties.  See Restatement (Second) Conflict of Laws section 188 (1971).  Section 188 asks the Court to take into account the following contacts to determine the applicable law: (a) the place of contracting;

---

[14] Weigend was the last person to sign the contract in January 2005 in CA, and both Dr. Martin and Francisco were in San Francisco, California when the August 2005 contract was signed.

(b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile residence, nationality, place of incorporation, and place of business of the parties.  Here, the place of contracting was San Francisco, California.  The place of negotiation of the contract took place over e-mail.  The performance of the contract took place around the world in places including, California, Oregon, Spain, and other places.  The location of the subject matter was in various places around the world because Weigend was offering consulting services on internet related technology.  The domiciles of the parties were in Oregon and California.

Oregon law probably governs the stock options Weigend earned from January 2005 to July 2005.  See *IBM vs. Dr Christopher H. Bajorek* 191 F. 3d 1033, 1040.  In the IBM case, the stock options did not run afoul of California law because the at the time the parties contracted to award stock options, the amount was not a precise amount, and therefore, the choice of law provision would apply.  Oregon probably has just as much a material of interest as California does in deciding the outcome for any stock options earned from January 2005 to July 2005.

The work done from July 2005 to May 2006 is a little more difficult to ascertain which law applies.  If the Court determines that Weigend is entitled to compensation at the same terms as the terms of his January 2005 contract, Oregon law probably applies as well because Weigend was cheated out of additional stock options.  If, however, the Court factually finds Weigend is entitled to additional cash compensation because he was not compensated for the reasonable value of his services, California law applies to the quantum merit period from July 2005 to May 2007 because Weigend, based in California, was the last person to agree to do additional work for Strands, and some of the services were rendered in California.  California has a materially greater interest for services for services rendered in California than Oregon does.  In a diversity

- 16 -

1   case, a federal court must apply the choice of law rules of the state in which the action was filed.

2   *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941);*

3   *Trans Meridian, 829 F.2d at 953.*

4        a.   **Modification without consideration makes modification invalid**

5        There was no consideration given for the 90-day stock option clause signed in August 2005

6   to modify the stock options agreed to in January 2005.  Even if the Court wants to use Oregon

7   law, Oregon law prohibits modifications to contracts without additional consideration.  In August

8   2005, after Weigend had already rendered services under the written contract covering Jan 2005

9   to July 2005, Strands modified the stock options to expire in 90 days from termination.  No

10  additional consideration was given for this modification.  It is the law of many states, including

11  Oregon, that to be binding, modification of a contract requires new consideration.  See *Anderson*

12  *v. Divito,* 138 Ore. App 272, 281-82.  Here, Weigend already performed services for Jan 2005-

13  July 2005.  Those stock options had already been earned. Strands never sent paperwork to

14  Weigend asking him to exercise his stock options until May 2007 because Weigend was never

15  terminated.[15]

16

17       Strands would have the Court believe the contract presented in the papers it filed is one

18  integrated contract.  It's not.  The stock option papers were signed in August 2005 and are

19  attached as Exhibit B.  The contract that was signed in January 2005 is present in Exhibit A.

20  Therefore, the 90-day stock option expiration clause is invalid.  Even if the court were to find

21  this clause to be valid, Weigend was not terminated properly because he didn't receive adequate

22  notice.  The May 13, 2006 e-mail Francisco sent is too vague.  Although defendants' have added

23  italicized what should have been italicized in the original e-mail, that doesn't change what else

24  was in the e-mail and it doesn't alter the problems with fixing a termination date without a legal

25

- 17 -

[15] Exhibit

basis for showing that the alleged termination e-mail was properly served and the effective date of service.

**b. Strands breached its duty of good faith and fair dealing**

The law imposes a duty of good faith and fair dealing in the performance and enforcement of every contract. That duty serves to effectuate the objectively reasonable expectations of the parties. *Pacific First Bank v. New Morgan Park Corp.*, 319 Ore. 342, 349-53, 876 P.2d 761 (1994); *Sheets v. Knight,* 308 Ore. 220, 233, 779 P.2d 1000 (1989); *Best v. U.S. National Bank,* 303 Ore. 557, 561-64, 739 P.2d 554 (1987).

Strands did not at all times act in good faith and deal fairly with Weigend.  For example, when it claims it terminated him on May 13, 2006, it did not send over the paperwork for him to exercise his stock options.  Nor did it communicate clearly to Weigend he was no longer the Chief Strategist.  Strands did not compensate him for the cost of preparing for the summer school in 2006 in Bilbao, Spain, and led him on to believe he was still working for the company so that they could try to backdate his termination.

**d. Some of the legal authorities cited by counsel do not apply**

ORS 41.720 has been repealed by 1981 c.892 section 98.[16]  Strands' counsel also cited *Abercrombie v. Hayden Corp,* 320 Or. 279, 292, 883 P.2d 845 (1994) to suggest, "the integrated written document would supersede" anything contrary to the 90-day stock option expiration clause.  *Abercrombie* doesn't apply because *Abercrombie* had to do with a real estate transaction and the statute of frauds in real estate transactions require everything to be in writing.  In addition, the *Abercrombie* case was questioned and subsequently criticized.  Furthermore, *Abercrombie* acknowledges that the contract has to be completely integrated for parole evidence to be excluded.  Here, we do not have a completely integrated contract because services were

- 18 -

[16] http://www.leg.state.or.us/ors/041.html

rendered before the August 2005 modification.  The *Kashmir* case counsel cited doesn't apply

because quantum meruit services were rendered for a period for which there was no written

contract.  Dr. Martin admits he didn't accept the terms proposed by Weigend in his May 13,

2006 e-mail, even though Weigend is proposing the same terms as his previous contract.

*Kashmir* applies when the quantum meruit period occurs during the same period for which there

is a written contract that covers that same period.  We agree that quantum meruit does not apply

for the period between January 2005 and July 2005.


IV.  CONCLUSION

    In summary, we just think there are too many critical facts in dispute.  We summarize those

main facts below:

CRITICAL MATERIAL FACTS IN DISPUTE

| STRANDS INC. CLAIMS: | WEIGEND CLAIMS: |
|---|---|
| The parties entered into a contract in January 2005 covering services rendered between January 2005 – July 2005 that had a clause that had the options expire within 90 days of termination. | The 90-day stock option expiration clause was signed on August 31, 2005, not January 2005, and after services had already been rendered and after the contract had already been entered into in January 2004 that covers January 2005 – July 2005.  The stock option modification documents were presented to Weigend to sign while Weigend was expected to do other work over dinner in August 31, 2005. |
| Weigend was terminated in December 2005, | He was not terminated. |

- 9

| | |
|---|---|
| January 2006, and May 2006. | |
| Weigend did not exercise his options within 90 days of May 2006. | Weigend requested an accounting of his stock options in June 2005.  Weigend also requested his options paperwork in July 2006. |
| Its CEO examined the corporate books and found that nothing was owed to Weigend. (Dr. Martin's declaration, P1 and P2.) | The corporate books show Weigend was a stock option holder when the company was bought in May 2007, long after Strands alleges when Weigend was terminated (see Exhibit G). |

Therefore, the motion for summary judgment should be denied.


By: /s/ David Wong

DAVID D. WONG

Attorney for Plaintiff Andreas S. Weigend

OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
C 08-00726 PJH